IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

AMERICA 2030 CAPITAL LIMITED,

    Plaintiff,

    v.

JOHN DOE & FACEBOOK, INC.,

    Defendant.

C.A. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DEFAMATION AND COPYRIGHT INFRINGEMENT

Plaintiff, AMERICA 2030 ("Plaintiff") hereby files this Complaint against JOHN DOE as fictitious name for the unknown author of the content on the content provider and publisher's website owned by the Company FACEBOOK, INC. ("Defendant Facebook") for Defamation, Defamation Per Se and Defamation by Implication. This is also an action for copyright infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 et seq. This suit is brought against the author of the action. However, since the content provider Facebook does not provide for the content provider and publisher's identity, the action is brought against the anonymous person under the fictitious name JOHN DOE. Since Facebook is the publisher of such content, this action is served against Facebook for publishing such defamatory content on their platform. In a recent court case, Facebook defended itself against allegations of fraud from Six4Three by citing themselves as a "publisher." Sonal Mehta, a lawyer for Facebook, said in court "The publisher discretion is a free speech right irrespective of what technological means is used. A newspaper has a publisher function whether they are doing it on their website, in a printed copy or through the news alerts." Facebook is notorious for being both a content provider and publisher of fake news campaigns. One example being the Cambridge Analytica Scandal, which revealed that Cambridge Analytica had harvested the personal data of millions of people's Facebook profiles without their consent and used it for political advertising purposes. Further, the European Union ("EU') has provided evidence of "coordinated inauthentic behavior" on online platforms ahead of the European Parliament elections in May. The EU said it found "continued and sustained disinformation activity" by sources on the Facebook platform. Further, the EU officials said Facebook should "step up their efforts" in fighting fake news, since they are a publisher of such news. In a joint statement and report, the EU reported evidence of "coordinated inauthentic behavior" such as bots and fake accounts trying spread divisive content on online platforms such as Facebook. The EU added it found "continued and sustained disinformation activity" by sources on the Facebook platform. Facebook agreed to an EU "Code of Practice on Disinformation" in 2018, making commitments to submit monthly reports on their efforts to remove fake news ahead of the election. Facebook likes fake news and to sensationalize content for it brings readers. Facebook has a habitual problem of telling the public and law makers that it

wants to combat fake news but on the other hand does nothing to remove or police such content, which is further evidence Facebook is considered a publisher of defamatory information.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

3. The claims asserted herein arise under and pursuant to 15 U.S.C. §1125; the Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

4. This action arises out of' violations of the United States Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. §§ 1051 ff, and the United States Copyright Act of 1976, Title 17 U.S.C. chapters 1 through 8 and 10 through 12. Thus, this Court also has subject matter jurisdiction under 28 U.S.C. §1331.

## THE PARTIES

5. Plaintiff AMERICA 2030 at all times material and relevant hereto, is a Corporation in good standing formed in Colorado whose Registered Agent is located in Colorado Springs, El Paso County, State of Colorado. Plaintiffs are general purpose corporations and therefore do not have any higher duty or knowledge, other than that which a general-purpose corporation would have. Plaintiffs are part of a global consortium of mergers and acquisitions companies, in which one specialty includes securities lending.

6. Defendant Facebook is a corporation incorporated in the state of Delaware. Facebook does substantial business in all 50 states, including Florida and in this district. This suit is brought against the author of the action. However, since the content provider and publisher Facebook does not provide for the content provider's identity, the action is brought against the anonymous person under the fictitious name JOHN DOE. Since Facebook is the publisher of such content, this action is served against Facebook for publishing such defamatory content on their platform. Facebook has a current market capitalization of 524 Billion U.S. dollars.

## STANDING

7. Plaintiff has standing to bring this action because he has been directly affected, victimized and severely damaged by the unlawful conduct complained herein. The Company injuries are proximately related to the conduct of Defendant Facebook. This suit is brought against the author of the action. However, since the content provider and publisher Facebook does not provide for the content provider's identity, the action is brought against the anonymous person under the

fictitious name JOHN DOE. Since Facebook is the publisher of such content, this action is served against Facebook for publishing such defamatory content on their platform.

## FACTS

8. Plaintiff operates a well-known business around the world.

9. Plaintiff engages in the business of stock loans.

10. Plaintiff has long maintained a page on Defendant Facebook's platform, where he engaged with fans and promoted his work.

11. The Facebook page "@valsklarov" appeared on Facebook platform providing in relevant part "AMERICA 2030 and his company are only concerned with manipulating people and stealing their hard-earned money." The exact page is provided in Exhibit A of this complaint. This suit is brought against the author of the action. However, since the content provider Facebook does not provide for the content provider's identity, the action is brought against the anonymous person under the fictitious name JOHN DOE. Since Facebook is the publisher of such content, this action is served against Facebook for publishing such defamatory content on their platform.

12. According to Defendant Facebook's own posted Community Standards, "Dangerous Individuals and Organizations" are defined as "organizations or individuals involved in the following: Terrorist activity, Organized hate, Mass or serial murder, Human trafficking, [or] Organized violence or criminal activity.

13. Such a statement as "AMERICA 2030 and his company are only concerned with manipulating people and stealing their hard-earned money" should be flagged by Facebook content moderators or the Facebook platform itself. In a recent court case, Facebook defended itself against allegations of fraud from Six4Three by citing themselves as a "publisher." Sonal Mehta, a lawyer for Facebook, said in court "The publisher discretion is a free speech right irrespective of what technological means is used. A newspaper has a publisher function whether they are doing it on their website, in a printed copy or through the news alerts." Facebook is notorious for being both a content provider and publisher of fake news campaigns. One example being the Cambridge Analytica Scandal, which revealed that Cambridge Analytica had harvested the personal data of millions of people's Facebook profiles without their consent and used it for political advertising purposes. Further, the European Union ("EU') has provided evidence of "coordinated inauthentic behavior" on online platforms ahead of the European Parliament elections in May. The EU said it found "continued and sustained disinformation activity" by sources on the Facebook platform. Further, the EU officials said Facebook should "step up their efforts" in fighting fake news, since they are a publisher of such news. In a joint statement and report, the EU reported evidence of "coordinated inauthentic behavior" such as bots and fake accounts trying spread divisive content on online platforms such as Facebook. The EU added it found "continued and sustained disinformation activity" by sources on the Facebook platform. Facebook agreed to an EU "Code of Practice on Disinformation" in 2018, making commitments to submit monthly reports on their efforts to remove fake news ahead of the election. Facebook likes fake news and to sensationalize content for it brings readers. Facebook has a habitual problem of telling the public and law makers

that it wants to combat fake news but on the other hand does nothing to remove or police such content, which is further evidence Facebook is considered a publisher of defamatory information.

## FIRST CAUSE OF ACTION
*Lanham Act*

14. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

15. The Plaintiff's trademarks and names for "America 2030 Capital Limited" are protected by the Lanham Act and any content provider that keeps such information on their website is in violation of the act.

16. As described above, Defendants have used Plaintiff's name and persona by advertising and representing that the information on Facebook's page were true, when in fact, they were not.

17. In addition, Facebook has, with knowledge, induced, caused or materially contributed to the infringing conduct, by unreasonably delaying in removing the contents provided in Exhibit A despite notification of its existence and the harm that was occurring, and Facebook was put on notice by way of written letter.

18. Defendants' actions as described herein are in direct violation of Section 43(a) of the Lanham Act (15 U.S.C. §1125).

19. As a direct and proximate result of Defendants' actions as stated herein, Plaintiff has suffered significant damage to reputation. Further, Plaintiff is entitled to enhanced damages as a result of Defendants' malicious actions described above.

20. The acts of Defendants are believed to be willful and accordingly, Plaintiff is entitled to receive treble damages as a result of Defendants' actions. Similarly, this is an exceptional case, warranting an award of attorneys' fees to Plaintiff in an amount to be proven at trial.

21. As a direct and proximate result of said wrongful conduct by Defendants, Plaintiff has suffered damages in an amount to be proven at trial.

22. Unless Defendants are preliminarily and permanently enjoined from deleting the information from the Fake account on Facebook, Plaintiff will be irreparably harmed in a manner in which he cannot be adequately compensated in money damages. Plaintiff accordingly also seeks injunctive relief against Defendants.

23. The images that the Plaintiff seeks to have removed from the Defendants' websites by way of this lawsuit were kept on the Plaintiff's website. Accordingly, Plaintiff owns the copyright in such images. Indeed, it is evident on the face of the images that the photographs were taken by the Plaintiff herself.

24. While section 43(a)(1)(A) of the Lanham Act protects against customer confusion regarding the source of artists' works, section 43(a)(1)(B) protects against third parties misrepresenting artists' works through commercial activity

25. The elements of a false endorsement claim under the Lanham Act are that the defendant, (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services. Lanham Trade-Mark Act, § 43(a)(1), 15 U.S.C.A. § 1125(a)(1). Roberts v. Bliss, 229 F. Supp. 3d 240 (S.D.N.Y. 2017)

26. Elements of a false endorsement claim under the Lanham Act are that (1) the defendants have a protectable trademark, and (2) a likelihood of confusion will exist as to the origin of the plaintiff's products. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a). All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc., 940 F. Supp. 2d 850 (C.D. Ill. 2013)

27. To prevail on a claim for trademark infringement and unfair competition under the Lanham Act, a plaintiff must establish the following three elements: 1) that the mark is valid and legally protectable; 2) that the plaintiff owns the mark; and 3) that the defendant's use of the mark is likely to cause confusion. Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 711 (3d Cir. 2004). Steer Mach. Tool & Die Corp. v. SS Niles Bottle Stoppers, LLC, 331 F. Supp. 3d 429, 432 (M.D. Pa. 2018).

28. To succeed on a trademark infringement or an unfair competition claim under the Lanham Act, a plaintiff must prove that: (1) the plaintiff's mark is entitled to protection, and (2) defendant's use of the allegedly infringing mark would likely cause confusion with the plaintiff's mark. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq. CSL Silicones, Inc. v. Midsun Grp. Inc., 301 F. Supp. 3d 328 (D. Conn. 2018)

29. Here, the Defendants are in direct violation of the Lanham Act by allowing the contents from Exhibit A of this filing remain on their website, which is in direct violation of both Plaintiff's trademark rights and the community guidelines of the company themselves.

## SECOND CAUSE OF ACTION
*Defamation*

30. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

31. Defamatory material about a Colorado entity placed on the Web and accessible in Colorado constitutes an "electronic communication into Florida" when the material is accessed (or "published") in Colorado. In the context of the World Wide Web, given its pervasiveness, an alleged tortfeasor who posts allegedly defamatory material on a website has intentionally made the material almost instantly available everywhere the material is accessible. By posting allegedly defamatory material on the Web about a Colorado entity, the poster has directed the communication about a Colorado entity to readers worldwide, including potential readers within Florida. When the posting is then accessed by a third party in Colorado, the material has been

"published" in Colorado and the poster has communicated the material "into" Colorado, thereby committing the tortious act of defamation within Florida. This interpretation is approach taken regarding other forms of communication. Internet Sols. Corp. v. Marshall, 39 So. 3d 1201, 1214–15 (Fla. 2010).

32. To create liability for common-law defamation, claimant must establish the following: (1) a false and defamatory statement, (2) unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Restatement (Second) of Torts § 558. In re Food Mgmt. Grp., LLC, 359 B.R. 543 (Bankr. S.D.N.Y. 2007).

33. The five elements of defamation under Louisiana law are: (1) defamatory words; (2) publication to a person other than the one defamed; (3) falsity; (4) malice; and (5) resulting injury. Hoffman v. Bailey, 257 F. Supp. 3d 801 (E.D. La. 2017).

34. To create liability for common-law defamation, claimant must establish the following: (1) a false and defamatory statement, (2) unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Restatement (Second) of Torts § 558. In re Food Mgmt. Grp., LLC, 359 B.R. 543 (Bankr. S.D.N.Y. 2007).

35. If a court determines that the words at issue in a defamation claim under Louisiana law are not objectively capable of having a defamatory meaning, then a plaintiff's claim is not actionable and may be dismissed on a defendant's summary judgment. Hoffman v. Bailey, 257 F. Supp. 3d 801 (E.D. La. 2017)

36. Elements of defamation claim include (1) false and defamatory statement concerning another, (2) unprivileged publication to a third party, (3) fault amounting at least to negligence on part of publisher, and (4) either actionability of statement irrespective of special harm or existence of special harm caused by publication. Restatement (Second) of Torts § 558. Thomas v. Jacksonville Television, Inc., 699 So. 2d 800 (Fla. Dist. Ct. App. 1997).

37. The elements of a claim for defamation are as follows: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." Jews for Jesus, Inc. v. Rapp, 997 So.2d 1098, 1106 (Fla.2008). Internet Sols. Corp. v. Marshall, 39 So. 3d 1201, 1214 (Fla. 2010)

38. Defendant Facebook published the malicious, false and defamatory statements that Plaintiff had promoted or engaged in violence and hate.

39. Defendant Facebook published the malicious, false and defamatory statements that Plaintiff was a dangerous Corporation.

40. This false and misleading statements were published with malice, as Defendant Facebook knew that they were false and misleading, or at a minimum acted and published with a reckless disregard for the truth.

41. Plaintiff has been severely harmed and damaged by these and other false and misleading statements by Defendant Facebook, because they subjected him to hatred, distrust, ridicule, contempt, and disgrace, and the threat of severe bodily injury or death by those who are now led to believe that he is dangerous.

42. Plaintiff has been severely damaged by these false and misleading statements because they damaged Plaintiff's reputation and good will and severely harmed financially in her profession and business as a conservative investigative journalist, as well as personally.

43. Everyone has a duty, especially when on notice. The fact that content providers and publishers have their own policies in place to montr content is because they already have recognized duty to be prudent and not to allow harmful content from being distirbuted. When content providers and publishers have recognized this, they acknowledge certain liability and certain duty. They arenot monitoring content because hy are Good Smartan., tey are doing so because they relaize that they have a duty to procet sociey and their readers from harm. For exmaple, when a food manufactor or a restruant opens for business, nowhere I sit written that their foods must not poison people.

44. Further, courts have rules that various actions are not protected by free speech. When author is unknown and hides behind a fake provide, content provies have an obligation to monitor and edit the content to asses if it is in vioaltion of their own policies or can cause harm to others.

## THIRD CAUSE OF ACTION
*Defamation Per Se*

45. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

46. If even one of the required elements of the defamation tort under Louisiana law is lacking, the cause of action fails Hoffman v. Bailey, 257 F. Supp. 3d 801 (E.D. La. 2017)

47. Even if a plaintiff makes a prima facie showing of the essential elements of a defamation claim under Louisiana law, a defendant may prevail by showing either that: (1) the statement was true, as truth is an absolute defense to defamation claims under Louisiana law; or (2) that the statements were protected by an absolute or qualified privilege. Hoffman v. Bailey, 257 F. Supp. 3d 801 (E.D. La. 2017)

48. Elements of defamation claim include (1) false and defamatory statement concerning another, (2) unprivileged publication to a third party, (3) fault amounting at least to negligence on part of publisher, and (4) either actionability of statement irrespective of special harm or existence of special harm caused by publication. Restatement (Second) of Torts § 558. Thomas v. Jacksonville Television, Inc., 699 So. 2d 800 (Fla. Dist. Ct. App. 1997).

49. If a court determines that the words at issue in a defamation claim under Louisiana law are not objectively capable of having a defamatory meaning, then a plaintiff's claim is not actionable and may be dismissed on a defendant's summary judgment. Hoffman v. Bailey, 257 F. Supp. 3d 801 (E.D. La. 2017).

50. Defendant Facebook, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff, which were republished widely elsewhere. Specifically, Defendant Facebook published in this district, nationally and internationally the falsity that Plaintiff is a "dangerous" Corporation that has engaged in discrimination.

51. Under Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise *of his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973)

52. These false, misleading and defamatory statements were published in this district, domestically and internationally on the internet and elsewhere for the entire world to see and hear. Facebook is notorious for being both a content provider and publisher of fake news campaigns. One example being the Cambridge Analytica Scandal, which revealed that Cambridge Analytica had harvested the personal data of millions of people's Facebook profiles without their consent and used it for political advertising purposes. Further, the European Union ("EU') has provided evidence of "coordinated inauthentic behavior" on online platforms ahead of the European Parliament elections in May. The EU said it found "continued and sustained disinformation activity" by sources on the Facebook platform. Further, the EU officials said Facebook should "step up their efforts" in fighting fake news, since they are a publisher of such news. In a joint statement and report, the EU reported evidence of "coordinated inauthentic behavior" such as bots and fake accounts trying spread divisive content on online platforms such as Facebook. The EU added it found "continued and sustained disinformation activity" by sources on the Facebook platform. Facebook agreed to an EU "Code of Practice on Disinformation" in 2018, making commitments to submit monthly reports on their efforts to remove fake news ahead of the election. Facebook likes fake news and to sensationalize content for it brings readers. Facebook has a habitual problem of telling the public and law makers that it wants to combat fake news but on the other hand does nothing to remove or police such content, which is further evidence Facebook is considered a publisher of defamatory information.

53. Specifically, Defendant Facebook published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of her lawful business, trade, profession or office as a journalist, as well as personally.

54. These false and misleading statements were published with malice, as Defendant Facebook knew that they were false and misleading, and/or at a minimum acted and published with a reckless disregard for the truth.

55. These false, misleading, and defamatory statements are defamatory *per se* because these false and misleading statements severely harmed and damaged Plaintiff in the Company's profession and business as an investigative journalist, as they concern conduct and characteristics incompatible with being an investigative journalist, and personally. Damage is presumed by law when defamation *per se* is shown as alleged herein.

56. A stock loan creditor's reputation is paramount. Falsely labeling Plaintiff as "dangerous" and falsely accusing the Company of having engaged in hate and/or violence damages the Company's good will and reputation, making it impossible for her to successfully continue her profession and also harms the Company personally as alleged herein.

## **FOURTH CAUSE OF ACTION**
*Defamation By Implication*

57. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if fully set forth herein.

58. Defamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory. Restatement (Second) of Torts §§ 558B, 580A–580B. Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098 (Fla. 2008).

59. In defamation cases, the interest sought to be protected is the objective one of reputation, either economic, political, or personal, in the outside world. Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098 (Fla. 2008).

60. Doctrine of compelled self-defamation, pursuant to which publication element for defamation would be eliminated, was not recognized in state, and thus employee, who alleged that he was compelled by law to disclose to prospective employers her former employer's false reasons for her termination, which had been communicated by former employer to her alone, failed to satisfy publication element to state defamation claim against former employer. Valencia v. Citibank Int'l, 728 So. 2d 330 (Fla. Dist. Ct. App. 1999)

61. Defamation is not a question of the existence of some individual or individuals with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent. Restatement (Second) of Torts § 559 cmt. e. Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098 (Fla. 2008).

62. Doctrine of compelled self-defamation, pursuant to which publication element for defamation would be eliminated, was not recognized in state, and thus employee, who alleged that she was compelled by law to disclose to prospective employers her former employer's false reasons for her termination, which had been communicated by former employer to her alone, failed to satisfy

publication element to state defamation claim against former employer. Valencia v. Citibank Int'l, 728 So. 2d 330 (Fla. Dist. Ct. App. 1999)

63. Defendant Facebook published numerous false, misleading and defamatory statements about Plaintiff, as set forth in the preceding paragraphs.

64. These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, nationally and internationally for the entire world to see and hear.

65. These false and misleading statements were published with malice, as Defendant Facebook knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

66. These statements created the false and misleading implication that Plaintiff has engaged in hate and/or violence as is a "dangerous" Corporation.

67. Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace, as well as put him life in danger by those who would seek to retaliate against him.

68. Plaintiff has been damaged by these false and misleading statements because the statements severely harmed Plaintiff in him profession and business as an investigative journalist, as well as personally, as pled herein.

69. Plaintiff has requested pursuant to Colorado law that these defamatory statements be retracted, an apology made and that he be reinstated on Facebook and Instagram. Defendant Facebook has arrogantly and unlawfully ignored this request and the defamation as pled herein is on-going and compounded each and every day.

## FIFTH CAUSE OF ACTION
*Breach of Fiduciary Duty*

70. Publisher's and content providers and publishers have a fiduciary duty to not cause harm to those who use their platform and their own customers on the platform must be protected from defamation. Facebook has previously been exposed with fake pages and it is in the public interest and society to reduce the number of fake pages of distribution. Publishers have a duty to not cause harm to others, not to distribute false or malicious information at the expense of others and not to perpetrate fraud or harm.

71. Directors of corporations, in fulfilling their managerial responsibilities, are charged with certain fiduciary duties.  The primary duties are the duty of care and the duty of loyalty.

72. The duty of care requires that directors inform themselves "prior to making a business decision, of all material information reasonably available to them." *Smith v. Van Gorkem*, 488 A.2d 858 (1985).

73. Whether the directors were informed of all material information depends on the quality of the information, the advice available, and whether the directors had "sufficient opportunity to acquire knowledge concerning the problem before action." *Moran v. Household Intern., Inc.*, 490 A.2d 1059 (1985).

74. Moreover, a director may not simply accept the information presented. Rather, the director must assess the information with a "critical eye," so as to protect the interests of the corporations and its stockholders. *Smith v. Van Gorkem*, 488 A.2d 858 (1985).

75. The duty of loyalty means that all directors and officers of a corporation working in their capacities as corporate fiduciaries must act without personal economic conflict. As the Delaware Supreme Court explained in *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939), "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interest."

76. Under the duty of good faith, a corporation's directors and officers must advance interests of the corporation and fulfill their duties without violating the law. *In re The Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006).

77. Under the duty of confidentiality, a corporation's directors and officers must keep corporate information confidential and not disclose it for their own benefit. *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939).

78. Under the duty of prudence, a trustee must administer a trust with a degree of care, skill, and caution that a prudent trustee would exercise. *Amgen Inc. v. Harris*, 577 U.S. __ (2016).

79. This duty requires directors to act with "complete candor." In certain circumstances, this requires the directors to disclose to the stockholders "all of the facts and circumstances" relevant to the directors' decision. *Amgen Inc. v. Harris*, 577 U.S. __ (2016).

80. Some courts have not required officers of a charity to abide by the same rules as corporate officers. For example, an officer may be allowed to deal in a manner financially advantageous to himself or herself, so long as the charity is not subject to any expense. This does not mean, however, that an officer of a charity is permitted to divert earning capacity of his charity to himself. *Boston Athletic Assoc. v. Int'l Marathons, Inc.*, 392 Mass. 356 (1984); *Samuel & Jessie Kenney Presbyterian Home v. State*, 174 Wash. 19 (1933).

81. Certain relationships impose fiduciary duties. For example, attorneys have a fiduciary duty to their client, a principal to his agent, a guardian to his ward, a priest to his parishioner, and a doctor to his patient. Fiduciary duty is imposed whenever confidence is reposed on one side in a contractual relationship, so as to allow that side to exert influence and dominance over the other.

82. Here, Facebook makes profits based on readership, the more pages it has the more content, the higher the number of readers and profits Facebook generates. Facebook has previously been

exposed with fake pages and it is in the public interest and public policy to reduce the number of fake pages of distribution. Publishers have a duty to not cause harm to others, not to distribute false or malicious information at the expense of others and not to perpetrate fraud or harm. Plaintiff has been defamed, his business has been extorted and the content provider has tortuously interfered with his profits.

## SIXTH CAUSE OF ACTION
*Extortion, Tortious interference, Conspiracy*

83. Content providers and publishers may be held liable for extortion, tortious interference, and conspiracy to promote extortion, harassment, bullying, and doxing.

84. The use of force, or the threat of force, to obtain money, something else of value, or services from a person is often known as the criminal offense of extortion. Many jurisdictions classify extortion as a "crime against property" or a theft-related offense, but the threat of harm to a person is an essential element of the offense. This could consist of physical harm, financial harm, destruction of property, or abuse of official power.

85. The extortion statute defines the offense based on two elements, the alleged perpetrator's objective and the means used, offers a good example of extortion's legal definition. The statute prohibits a person (1) from obtaining someone else's property or "an official act of a public officer;" (2) by wrongfully using force against the person, instilling fear of harm in the person, or acting "under color of official right."

86. Under federal law, the offense of extortion typically requires the use of interstate communications to make a threat. Threats to federal or foreign officials in order to obtain some sort of official benefit may also be prosecuted as extortion under federal law. Certain federal officials are subject to additional statutes of regulations regarding extortion, such as laws prohibiting customs officials from demanding additional fees at ports.

87. An agreement between two or more people to commit an illegal act, along with an intent to achieve the agreement's goal.  Most U.S. jurisdictions also require an overt act toward furthering the agreement.  An overt act is a statutory requirement, not a constitutional one. See *Whitfield v. United States*, 453 U.S. 209 (2005). The illegal act is the conspiracy's "target offense."

88. Tortious interference, in the common law of torts, occurs when one person intentionally damages someone else's contractual or business relationships with a third party causing economic harm.

89. Here, Facebook makes profits based on readership, the more pages it has the more content, the higher the number of readers and profits Facebook generates. Facebook has previously been exposed with fake pages and it is in the public interest and public policy to reduce the number of fake pages of distribution. Publishers have a duty to not cause harm to others, not to distribute false or malicious information at the expense of others and not to perpetrate fraud or harm. Plaintiff has been defamed, his business has been extorted and the content provider has tortuously interfered

with his profits. Thus, there is strong evidence the content provider engages in extortion, tortious interference, and conspiracy to promote extortion, harassment, bullying, and doxing to further increase their profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant Facebook as follows:

Awarding Plaintiff compensatory including actual, consequential, and incidental damages for malicious defamatory conduct as alleged herein in an amount to be determined at trial and in excess of $40,000,000 U.S. Dollars.

Awarding punitive damages for Defendant Facebook's malicious defamatory conduct based on the routine and accepted calculation of 5 percent of Facebook's market capitalization of 524 Billion U.S. dollars. Thus, punitive damages are requested be awarded by the jury in an amount to exceed $ 26 Billion U.S. dollars, which amount of punitive damages are designed to sufficiently punish Defendant Facebook in order that its illegal conduct not reoccur.

Awarding Plaintiff attorney's fees and costs.

Granting any such further relief as the Court deems appropriate including preliminary and permanent injunctive relief.

**JURY TRIAL DEMANDED**

Dated: August 21, 2019

*/s/ Jaitegh Singh*
Jaitegh Singh, Esq. #48585
Attorney for Plaintiffs
7424 S University Blvd
Ste E PMB 85099
Centennial, CO 80122
212-687-2578
jt@jtsinghlaw.com

# **EXHIBIT A:**

Email or Phone
Password
Log In
Forgot account?

# Val Sklarov

@theValSklarov

- **Home**
- Posts
- Reviews
- Photos
- About
- Community

Create a Page

Like | Share | Suggest Edits | ···

Learn More | Send Message

## Posts

**Val Sklarov**
August 16 at 9:17 AM ·

**Val Sklarov updated their website address.** Learn More

Like Comment Share

**Val Sklarov**
August 9 at 8:06 AM ·

https://www.scamguard.com/val-sklarov/

#ValSklarov #america2030 #scammerexpose #scam #scammer #fraud #theif #scammaster #scamming #scammeralert #alertscam #scamartist #conartist #moneyscammer #scamwarn #valsklarovconartist #valsklarovscammer #sklarovscammer #InvestmentScam #SECScam #ValSklarovCrook #ScamSchemes #ValSklarovDestroyer #ValSklarovThief #LakeForestScam #beaware

SCAMGUARD.COM
Val Sklarov >> 1 complaint & reviews | SCAMGUARD™

No Rating Yet

Why should you be aware of scammers like Val Sklarov?

Scammers like Val Sklarov are blood-sucking parasites. They only seek to benefit themselves at the e...

See More

**Community** See All

111 people like this

112 people follow this

**About** See All

**Contact Val Sklarov on Messenger**

www.scamguard.com/val-sklarov

Public Figure

**Page Transparency** See More

Facebook is showing information to help you better understand the purpose of a Page. See actions taken by the people who manage and post content.

Page created - June 27, 2019

**People**

**111** likes

**See more of Val Sklarov on Facebook**

Log In or Create New Account



